## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MARIA MCSWAIN,<br><br>                              Plaintiff,<br><br>v.<br><br>WORLD FUEL SERVICES CORPORATION,<br><br>                              Defendant. | Case No. _____<br><br>COMPLAINT FOR VIOLATIONS OF THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT, DEMAND FOR DAMAGES, REQUEST FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL<br><br>EXEMPT FROM FILING FEES PURSUANT TO 38 U.S.C. § 4323(h)(1) |

Plaintiff, Maria McSwain, by and through his undersigned attorneys, brings this Complaint against World Fuel Services, Corporation ("WFS"), and alleges as follows:

### NATURE OF THE CASE

1.      This is a civil action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301 - 4335 ("USERRA") challenging Defendant's violations of her rights as a veteran regarding her service in the Armed Forces of the United States.

2.      Ms. McSwain seeks all relief available under USERRA, including her lost wages and benefits as well as liquidated damages for Defendant's willful violation of USERRA.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 38 U.S.C. § 4323(b).

4.      The United States District Court for the Southern District of Florida is a proper venue for this action under 38 U.S.C. § 4323(c)(2), because Defendant WFS is a company that

maintains a place of business in this judicial district. Additionally, venue is proper under 28 U.S.C. § 1391(b) because all or a substantial part of the events giving rise to this action occurred in this district.

## PARTIES

5. Plaintiff Maria McSwain is a current resident of Coral Gables, Florida. Ms. McSwain has worked for WFS since 2015 and honorably served as a Master Sergeant in the U.S. Air Force Reserves at all times relevant to this lawsuit.

6. Defendant World Fuel Services Corporation ("WFS") is an energy and fuel procurement, fulfilment, distribution, and consultation firm headquartered in the city of Miami, Florida. Defendant WFS maintains a place of business within this District. Defendant WFS is an employer for the purposes of USERRA, 38 U.S.C. § 4303(4), because WFS employed, managed and controlled Ms. McSwain's daily activities throughout her employment with WFS. Additionally, WFS is a federal contractor.

## FACTS

7. Ms. McSwain started work at WFS on or about March 23, 2015. WFS employed Ms. McSwain as a Senior Human Resources Generalist making $80,000/year with a 10% bonus. Among other things, Ms. McSwain's job responsibilities included ensuring that the company was compliant with U.S. immigration and veteran employment rules and regulations.

8. Bernardo Buraglia – WFS's Vice President of "People Operations" – served as Ms. McSwain's supervisor. Mr. Buraglia reported to WFS's Chief Executive Officer (CEO), Michael Kasbar. Mr. Buraglia, WFS's CEO, and Ms. McSwain all worked in the same building located at 9800 NW 41st St, Miami, FL 33178.

9. Mr. Kasbar knew that Ms. McSwain was a military reservist.

10.     Upon information and belief, Nicole Turner (more on her below), Maria Palacio (more on her below), Fernando Casadeval (more on him below), Mike Lundberg (more on him below) and/or Ken Gavsie (more on him below) informed Mr. Kasbar that Ms. McSwain complained of being discriminated against by WFS on account of her military reserve status.

11.     Mr. Buraglia's resignation letter references issues to which he made Mr. Kasbar aware and one of those issues was, upon information and belief, Ms. McSwain's military reserve service and/or her complaints of discrimination stemming from that military service.

12.     From March 2015 through July 2016, Ms. McSwain's military commitments required that she performed military duty one weekend per month but, from time to time, miss between one to three weeks of work.

13.     Ms. McSwain timely informed Mr. Buraglia of these military-related work absences to which Mr. Buraglia would respond by saying words to the effect of, "it's not right that you're getting a paid military vacation when there's work to be done" or "you need to start thinking about your career here because your military duty is hindering your progression since you're always gone when important things happen" or "you may just want to go on active duty with the military instead of subjecting the company to all of these absences."

14.     In addition to the above-comments, Mr. Buraglia would grow standoffish and serious whenever Ms. McSwain brought up her military reserve service. Whenever Ms. McSwain discussed her military service obligations with Mr. Buraglia he (Buraglia) would cross his arms or look out the window – actions Ms. McSwain perceived as disrespectful to her and her military service.

15.     And when Ms. McSwain returned from her military leave Mr. Buraglia would express displeasure with both him and others having to "pick up the slack" while Ms. McSwain was absent for military duty.

16.     In mid to early July 2016 Ms. McSwain requested a compensation title review from Mr. Buraglia. The purpose of this request was to ensure that her job description aligned with the work she was actually performing; and, in turn, ensure that she was compensated accordingly. Based on Ms. McSwain's experience with the company such compensation review requests were both normal and routinely granted.

17.     On July 28, 2016 Ms. McSwain met with Mr. Buraglia in furtherance of the compensation and title review process. Ms. McSwain gave a PowerPoint presentation, told Mr. Buraglia that her job responsibilities had increased, and ended the presentation requesting a compensation increase and job description change.

18.     Mr. Buraglia ended the meeting with no overt objection to Ms. McSwain's compensation increase request but told Ms. McSwain that she would have to re-write her job description and then give it to Mr. Burgaila who, in turn, would send it to Total Rewards for review.

19.     Total Rewards was led by Nicole Turner. Total Rewards, which is located in the same building where Ms. McSwain works, is a function within the HR department that managers and establishes all the elements that make up a total compensation and benefits package for employees, to include, base pay, stock options, long term cash incentives, health, dental, and vision benefits, retirement contributions, life insurance, paid time off and bonuses.

20.     On or about August 26, 2016, Ms. McSwain re-wrote her job description and sent it to Mr. Buraglia. Mr. Buraglia, after some follow up requests from Ms. McSwain, edited the job

description document and, following Ms. McSwain's acceptance of Mr. Buraglia's edits, sent the job description to Total Rewards.

21.     On September 12, 2016, Ms. McSwain received military orders. Ms. McSwain immediately informed Mr. Buraglia who reacted in stating words to the effect of "so are you are going to be getting paid while you are gone on this trip again?!" Mr. Buraglia growled words to the effect of "you better get someone trained to manage the critical aspects before you leave" and "you better realize that many projects would suffer due to my absence." Mr. Buraglia then asked if the person who hired Ms. McSwain (Sue Rider) knew whether Ms. McSwain was in the military when Ms. McSwain interviewed with the company and got hired.  Mr. Buraglia ended the conversation saying words to the effect of "do we have to hire you back" and "do you think it's fair that you get to go away, get paid, and come back as if nothing happened?!" Mr. Buraglia's anger was palpable. From that point on Mr. Buraglia avoided talking to Ms. McSwain unless it was necessary.

22.     The deployment orders Ms. McSwain received on or about September 12, 2016 were for the January 12, 2017 – August 27, 2017, timeframe.

23.     On or about November 16, 2016, Ms. McSwain met with Mr. Buraglia. During that meeting Ms. McSwain learned that Nicole Turner, the Vice President of Total Rewards, recommended that Ms. McSwain be promoted to Manager but that Mr. Buraglia and Ms. Turner nonetheless decided that Ms. McSwain's promotion not be effective until Ms. McSwain returned from her military deployment. Mr. Buraglia explained that the reason for the promotion's delay was because doing so would cost the company additional money under the company's military leave continuation policy – a policy implemented in 2010 in an effort to increase military representation and capitalize on military engagement opportunities to help increase the military

and government business. Mr. Buraglia said that if Ms. McSwain was promoted before leaving for military duty such a promotion would "put the company at a disadvantage in that promoting [her] would be unreasonable."

24.    WFS is a federal government contractor.

25.    WFS, as part of the federal bidding process, uses the fact that it offers pay continuation as a means of enticing federal government agencies to award WFS federal contracts and increase military representation and does this, in part, because at least one report makes clear that federal contractors who hire military in greater numbers are more likely to win contracts when competing with other contractors.[1]

26.    WFS, upon information and belief, utilizes the Returning Heroes Tax Credit which provides companies with up to $5,600 for hiring a veteran.

27.    Upon information and belief, WFS monitors the amount of military pay continuation it pays reservists because such differential pay is an operating expense.

28.    And while WFS advertises that it provides "pay continuation" for military reserve employees, it does not always pay that benefit to military reserve employees and has not paid that benefit to at least four other military reserve-employees while paying that benefit, in at least one instance, to a person who is not a member of the reserve components of the US Armed Services.

29.    One of WFS's goals as a company is to monitor operating expenses so as to ensure such expenses are not over budget.

30.    Ms. McSwain, who at the time had served in excess of 14 years in the military, knew that while federal law protecting military reservists did not always require the payment of

---

[1] *See* Employing America's Veterans - Perspective from Business p. 18 n. 26 & 35 *available at* https://benefits.va.gov/vow/docs/employingamericasveterans.pdf (*last visited* February 13, 2020)

salary continuation it *always* barred an employer from making any adverse employment decision on account of an employee's obligation to serve in the military.

**(The Protected Activity)**

31.     Recognizing that delaying a promotion because of a military obligation violated federal law (USERRA) Ms. McSwain, on the evening of November 16, 2016, emailed Ms. Turner and Mr. Buraglia and informed them, *inter alia,* that delaying a promotion because of an employee's military service obligation violated USERRA. To wit:

> Today I was informed regarding my position and salary review as follows:
>
> 1. Total Rewards recommended promotion to a higher level,
> 2. Both you and Nicole decided that my promotion will not be submitted for approval until my return from deployment,
> 3. It would not be justifiable to receive that promotion as a prepare to leave the company to serve on active duty, and
> 4. The company would be at a disadvantage due to its military policy which grants pay continuation for up to six months to members of the Armed Forces who are called to serve on active duty.
>
> I thought long and hard about this determination, and while I truly want to be fair to the company, I also believe there are several things that have not been considered here:
>
> 1. The position and salary review was requested by me prior to receiving official deployment orders,
> 2. The pay continuation policy was implemented years prior to my date of hire,
> 3. I disclosed that I was a member of the Active Reserves during my first interview at World Fuel,
> 4. A promotion was recommended based on accomplishments during my tenure,
> 5. The decision of delaying the promotion until my return from deployment is not in compliance with the United States Employment and Reemployment Act (USERRA), which states:
>
> *If you:*
> ● *are a past or present member of the uniformed service;*
> ● *have applied for membership in the uniformed service; or*
> ● *are obligated to serve in the uniformed service; then an employer may not deny you:*

    ○ *initial employment;*
    ○ *reemployment;*
    ○ *retention in employment;*
    ○ *promotion; or*
    ○ *any benefit of employment because of this status. In addition, an employer may not retaliate against anyone assisting in the enforcement of USERRA rights, including testifying or making a statement in connection with a proceeding under USERRA, even if that person has no service connection.*

Below please find the link to the DOL regulation:
    https://www.dol.gov/vets/programs/userra/aboutuserra.htm#employeerights

### (The Retaliation)

32.    On November 17, 2016, at around 9:00 AM, Mr. Buraglia approached Ms. McSwain while Ms. McSwain was sitting at her desk. In a loud and intimidating voice Mr. Buraglia reprimanded Ms. McSwain and did so in front of her coworkers. Among other things Mr. Buraglia growled that Ms. McSwain handled the situation "in the wrong way." Mr. Buraglia shouted that he was "very angry that [she] had copied Nicole on the email and that [she had] put it all in writing." Mr. Buraglia then stormed off.

33.    Later that day, in a closed-door meeting with Ms. McSwain, Mr. Buraglia demanded an apology and, again, reiterated that it was "extremely unprofessional of [her] to have sent the email to both [him] and Nicole." Mr. Buraglia said the "trust" between Ms. McSwain and him "was broken" and that it "would take a very long time" for him to be able to trust her again. Ms. McSwain stood her ground, refused to apologize, and based that refusal on the simple fact that one should not have to apologize for calling someone out on violating federal law. Mr. Buraglia was undeterred. He ended the conversation stating that he would "think about the situation for a couple of days" to give Ms. McSwain time to "apologize" to him about how "unprofessionally" she behaved.

34.     On November 18, 2016, Mr. Buraglia approached Ms. McSwain and asked if she wanted to "continue the meeting from yesterday" (read: apologize) to which Ms. McSwain declined.

35.     On November 21, 2016 Mr. Buraglia again approached Ms. McSwain and asked if she wanted to "continue the meeting" (read: apologize) and again Ms. McSwain declined. Unsure of what she needed to do, Ms. McSwain sought out the assistance of HR Business Partner Maria Palacio, who, in turn, informed Ms. McSwain that Ken Gavsie, the company's Labor Counsel, would "handle the situation" going forward.

36.     Later that day (November 21, 2016) Mr. Buraglia again approached Ms. McSwain and asked that they "continue the conversation" (read: apologize). Ms. McSwain declined and then approached Mr. Gavsie who stated Ms. McSwain should "continue the conversation." Mr. Gavsie then asked Ms. McSwain how much money she wanted as part of the promotion to which Ms. McSwain replied that she didn't ask for money, just the opportunity to be considered for promotion on her own merits. Mr. Gavsie stated that he would "look into the situation," but that it was "not out of the ordinary to be yelled at by a manager."

37.     Ms. McSwain duly followed Mr. Gavsie's advice – to continue to dialogue with her harasser – and (that same day – November 21, 2016) "continued the conversation" with Mr. Buraglia. Ms. McSwain told Mr. Buraglia that it was her belief that he was discriminating against her on account of her military service and that since Mr. Buraglia continually gave her grief whenever she went on military orders she felt the need to put it in writing to bring the issue to management's attention.

38.     Mr. Buraglia responded by, among other things, (a) demanding an apology, (b) stating that he (Buraglia) "told many people in HR about what you did and they all agree you

were out of line and unprofessional" and (c) concluding that Ms. McSwain lacks social skills, was inflexible, and does not know how to work with people. Mr. Buraglia' parting comment was to request that Ms. McSwain never copy anyone else on an email to him again.

39.     The "many people in HR" that Mr. Buraglia told about Ms. McSwain's complaint include Ms. Palacio, Mr. Gavsie, and Armando Villasana, WFS's HRIS Director.

40.     And per Mr. Buraglia, all three individuals agreed that Ms. McSwain's exercising of her right to complain of discrimination was "out of line and unprofessional."

41.     Mr. Buraglia's statements to Ms. McSwain regarding her alleged lack of social skills and inflexibility were consistent with pejorative comments Mr. Buraglia made regarding Ms. McSwain's military service. During at least one meeting Mr. Buragali, in Ms. McSwain's presence said "oh, you guys know Maria is in the military so please forgive her for being so direct."

42.     WFS ultimately "split the difference" by promoting Ms. McSwain on January 1, 2017 (as opposed to October 1, 2017). However, had WFS followed its normal practice, Ms. McSwain's promotion should have occurred in October 2016 – the date she was eligible for that promotion. WFS's delay in promoting Ms. McSwain (i.e. promoting Ms. McSwain in January 2017 as opposed to October 2016 as per the company's promotion cycle) cost Ms. McSwain lost wages from the October – December 2016 timeframe as well as the 3% merit increase associated with that higher pay grade. Indeed, WFS's practice is that of a person receives a promotion on or after January 1, then that person does not qualify to receive a merit increase effective April 1 of that year.

43.     Ms. McSwain deployed from January 12, 2017 to August 27, 2017. Ms. McSwain served in Kuwait. While deployed Ms. McSwain provided logistical support as part of Operation

Inherent Resolve, our County's operation focused on eradicating the Islamic State of Iraq in Syria (ISIS). Ms. McSwain performed honorably during that deployment and gave timely and proper notice of her intent to return to work.

44. While deployed Ms. McSwain learned that Mr. Buraglia gave her a poor performance rating and did so on account of her oppositional and protected activity. The performance evaluation did not critique Ms. McSwain's ability to do her HR job; instead, it contained numerous anti-military stereotypes, i.e. that Ms. McSwain was like an "inflexible" drill sergeant who "unable to relate to people" Since the negative performance review had adverse career progression and financial implications because it was tied to her annual merit increase, Ms. McSwain, while deployed, reached out to WFS's HR to rectify the situation. Ultimately Manager, HR Operations, Nicole Stevens revised Ms. McSwain's performance evaluation.

45. Mr. Buraglia departed WFS's employment on or about January 13, 2017.

46. Ms. McSwain returned to work on August 28, 2017, a day after her orders ended whereupon Ms. McSwain reported directly to Michael Kasbar, CEO.

47. In November 2017 McSwain, at VP, Human Resources - Aviation and Marine Maria Palacio's request, applied for a Senior Manager HR Business Partner – Aviation & Marine position. Ms. McSwain applied, was given the position, and, at around that same time, was asked to take over the job responsibilities of Marie Bonnet, Corporate HR Business Partner who was going on maternity leave.

48. WFS utilizes a practice of providing "spot bonuses" for employees (like Ms. McSwain) who assume additional job responsibilities. The person responsible for recommending for spot bonuses in Ms. McSwain's case was Maria Palacio. Yet Ms. Palacio did not request a spot bonus for Ms. McSwain.

49.     From January 2018 through November 2018 Ms. McSwain worked her Sr Manager HR Business Partner duties for both the Corporate and Marine and Aviation segments along with approximately 65% of her pre-existing HR Compliance and Global Immigration responsibilities.

50.     From February 2018 through September 2018 Ms. McSwain missed approximately 16 days of work to perform military duties.

51.     Ms. McSwain informed Ms. Palacio of the above-referenced military leave periods and while Ms. Palacio did not say anything anti-military, her body language, tenor, and offhand comments about the "short notice" nature of the military absences, led Ms. McSwain to believe that Ms. Palacio was getting fed up with having to deal with Ms. McSwain's military service.

52.     Indeed, one of the above-reference periods of military duty was July 20 – July 23, 2018. During that period of military service Ms. Palacio called Ms. McSwain routinely and frantically regarding an immigration case that Ms. McSwain was working. When Ms. McSwain returned to work Ms. Palacio made Ms. McSwain feel like the immigration matter went sideways because Ms. McSwain was absent for military duty. Ms. Palacio ended the conversation saying words to the effect of "everything just happens to go wrong when you're on military leave."

**(The Protected Activity)**

53.     On September 25, 2018, Ms. McSwain told Ms. Palacio that she (Ms. McSwain) had just received notice of an October 1 – October 31, 2018 military deployment. Ms. McSwain apologized for the short notice to which Ms. Palacio, in a frustrated tone of voice, said words to the effect of "this is so short notice. Is there any way you can get out of this?"

54.     Ms. McSwain was not the only WFS employee called to military duty that month as Patricia Ojeda, a Financial Operations Coordinator III received military orders for the same October 1 – 31, 2018 timeframe.

55.     On September 27, 2018, Ms. McSwain, after learning from Ms. Ojeda that her supervisor was giving her grief about not providing official certified military orders informed Ms. Ojeda's supervisor that federal law did not require a departing servicemember to provide written copies of orders before leaving work to serve in the military.

56.     Ms. McSwain's communication that a reservist did not need to provide written copies of orders before deploying was consistent with U.S. Department of Labor ("DOL") regulations governing USERRA require servicemembers which provides, in relevant part, that "[t]he employee's notice to the employer may be either verbal or written. The notice may be informal and does not need to follow any particular format." 20 C.F.R. §1002.85(c)&(d). At times "[i]t may be impossible or unreasonable to give advance notice under certain circumstances. Such circumstances may include…a requirement that the employee report for uniformed service in an extremely short period of time." 20 C.F.R. §1002.86(b).

57.     On October 4, 2018, Ms. McSwain again contacted Ms. Ojeda's benefits department in Human Resources because it denied company related pay continuation policy benefits to Ms. Ojeda for not having the "correct type of orders".

58.     Ms. McSwain timely informed WFS of her intent to return to work following her October 1 – 31, 2018 military service and served honorably during that timeframe.

**(The Retaliation)**

59.    On November 1, 2018, Ms. McSwain returned to work whereupon she learned that all of her HR Business Partner peers in the corporate headquarters were promoted to Director along with the requisite pay and bonus increase.

60.    Ms. McSwain learned that the promotions took place October 1, 2018 - - - the date she began her military orders.

61.    The person who made the October 1, 2018 promotion decisions was Maria Palacio.

62.    The names, promotions titles, direct reports, education, responsibilities, and promotion dates of Ms. McSwain's peers who received the promotion on October 1, 2018 are as follows:

| Title Prior to Promotion | Promotion Title | Direct Reports | HR Degree | Manages multiple HR functions | HR Compliance and Labor Relations Expert | Promotion Date |
|---|---|---|---|---|---|---|
| Carmen Garcia – Sr. Manager HR Business Partner | Director, HR Business Partner | 0 | No | No | No | 10/1/2018 |
| Margie Toleto Sr. Manager HR Business Partner | Director, HR Business Partner | 1 | No | No | No | 10/1/2018 |
| Marie Bonnet – Sr. Manager HR Business Partner | Director, HR Business Partner | 0 | Yes | No | No | 10/1/2018 |
| Penelope Pena – Manager, HR Business Partner | Director, HR Business Partner | 1 | No | No | No | 10/1/2018 |

| Title Prior to Promotion | Promotion Title | Direct Reports | HR Degree | Manages multiple HR functions | HR Compliance and Labor Relations Expert | Promotion Date |
|---|---|---|---|---|---|---|
| Laura Fawley Manager – Talent Management | Sr Manager, Talent Management | 0 | No | No | No | 10/1/2018 |
| Maria McSwain – Sr. Manager HR Business Partner | No promotion | 1 | Yes | Yes | Yes | N/A |

63. On November 6, 2018, Ms. McSwain received a copy of a military discrimination complaint that Ms. Ojeda made to WFS's Legal Compliance regarding the Benefits department - - - the same department that miscalculated Ms. McSwain's pension benefits (more on that below).

64. On November 8, 2018, Ms. McSwain met with Ms. Palacio and inquired as to why she (Ms. McSwain) had not been promoted with her peers on October 1, 2018. During this meeting Ms. McSwain stated that she believed that her non-promotion was based on her having to go on military orders. Ms. Palacio did not deny Ms. McSwain's accusation nor explain why Ms. McSwain was not promoted but said she would "look into it."

65. On November 16, 2018, Ms. Palacio demoted Ms. McSwain by removing her from supporting Aviation and Marine aspects germane the Senior HR Business Partner position to which Ms. McSwain transferred into in January 2018. Ms. Palacio directed Ms. McSwain to work on Immigration and Compliance issues only because she "didn't need [Ms. McSwain] anymore".

66. This demotion impacted Ms. McSwain's professional reputation not only within the HR Department, but also with the Marine and Aviation business leaders. Ms. McSwain's peers assumed that Ms. McSwain was removed because she "didn't cut it.". Further, this without

cause demotion hindered Ms. McSwain's career progression. In 2019 a Director position opened in WFS's Land division, Ms. McSwain inquired about applying for that position but was told by the recruiting team that Ms. McSwaiin would never be considered for that role because she "didn't make it" as an HR Business Partner in Marine and Aviation.

67.     From the November 2018 timeframe through mid-2019 Ms. Palacio went out of her way to avoid Ms. McSwain unless interacting with Ms. McSwain was necessary.

68.     However during the May 2019 timeframe Ms. Palacio did ask Ms. McSwain to step into a newly vacant HR Business Partner for Corporate position. The newly vacated position previously belonged to Marine Bonnet (one of the people who was promoted over Ms. McSwain in October 2018). Ms. Bonnet recommended, to Ms. Palacio, that Ms. McSwain (and only Ms. McSwain) take over the position because Ms. McSwain (as opposed to the others who were promoted over her in October 2018) was able to handle the work. Ms. Bonnet told Ms. McSwain that she (Bonnet) made the recommendation to WFS's Chief Human Resources Officer who, in turn, directed Ms. Palacio to make the request.  This position supported over 260 corporate employees, global finance, marketing functions, legal functions, and related matters.

69.     Ms. McSwain accepted these duties; however, Ms. Palacio still required Ms. McSwain to fulfill her HR Compliance and Global Immigration duties as well. Yet Ms. McSwain received no additional compensation even though requests for additional compensation in instances like this are routinely made and granted.

70.     Ms. McSwain's job duties require that she approve all corporate bonuses, compensation increases and promotions. Ms. McSwain, who has processed approximately 250 bonuses and pay increases, is aware of no instance in which a manager's request for a subordinate's bonus or pay increase was denied.

71.     In June and July 2019 Ms. McSwain informed Ms. Palacio and Fernando Casadeval (the company's Chief Human Resources Officer) that Ms. McSwain's workload was continuing to increase as Global Immigration cases had in increased by about 50% year-over-year.  During the July 2019 timeframe Ms. McSwain provided Ms. Palacio a written analysis showing that she (Ms. McSwain) was the lowest compensated Senior HR Manager in the United States.

72.     Ms. Palacio did not respond to Ms. McSwain's request for additional compensation.

73.     Given Ms. Palacio's non-response, Ms. McSwain, on September 23, 2019, met with Mr. Casadeval whereupon Ms. McSwain told Mr. Casadeval that out of 28 HR Business Partners globally, Ms. McSwain had more employees assigned to her than 18 of them and that those individuals only had one job while Ms. McSwain had two different jobs. Ms. McSwain did this so Mr. Casadeval would understand the broad scope of Ms. McSwain's responsibilities and the need for increased compensation. Ms. McSwain told Mr. Casadeval that she completed her MBA at UNC Kenan-Flagler Business School (a top 20 school) and ended the conversation with words to the effect of "the company is experiencing veteran hiring difficulties because the company's veteran hiring numbers were well below the Office of Federal Contract Compliance targets."  In response to Ms. McSwain's report regarding veteran under-hiring, Mr. Casadeval said "we should just target military hires for driver jobs only" - - - the insinuation being that all veterans are capable of doing is driving truck. Mr. Casadeval ended the conversation by telling Ms. McSwain that he'd "look into it."

74.     On November 13, 2019, Ms. McSwain filed a company-internal military discrimination claim. Ms. McSwain's complaint, *inter alia,* accused Ms. Palacio of discriminating

against her for failing to promote her in October 2018 even though all of her non-military reserve peers received directorship promotions or like increases.

75.     Shortly thereafter Ms. McSwain learned that Mr. Gavsie would handle the complaint. This concerned Ms. McSwain because Mr. Gavsie had no experience handling employee grievances and Mr. Gavise's habit when receiving such complaints was to simply forward them to the HR Business Partner and Manager of the complaining party.

76.     On December 3, 2019, Ms. McSwain's belief was confirmed when she learned that Mr. Gavsie forwarded her complaint to Mr. Casadeval.

77.     On December 4, 2019, Ms. McSwain expressed concern about the mishandling of her discrimination complaint by informing Mike Lundberg, the company's legal compliance counsel as follows:

> Hi Mike,
>
> I decided to reach out to you to express my concern about how my complaint is being handled. The email below from Ken says that Fernando and he are handling the investigation. I have a degree in HR as well as formal training in the handling of employee grievances. I know that the appropriate person to investigate any discrimination complaint must be not only experienced and trained in conducting investigations, but also, impartial and objective, and have no reporting or personal relationship with either the complaining employee or the accused. Fernando is Maria's manager and I identified him as being aware of the issues before my complaint. How is he the appropriate person to handle this complaint? This is a conflict of interest. Further, it has been three weeks since I submitted my complaint and I have not received an update from anyone other than what you see in the email below.
>
> At his point, because I do not trust the process that the company is following to be fair, impartial, and objective and I have given the company countless chances to resolve this issue for over a year, I will be forwarding my complaint to the Department of Labor directly.
>
> Please let me know if I should provide Ken's name as a point of contact.

78.     Mr. Lundberg never responded to Ms. McSwain other than saying he would "follow up."

79.     Instead, on December 6, 2019, Mr. Gavsie called Ms. McSwain and admonished her for being so "impatient." Mr. Gavsie then told Ms. McSwain that WFS was "wrapping up the investigation" to which Ms. McSwain responded, "how can you be wrapping it up when you never even talked to me!" Mr. Gavsie said, "we didn't need to, your complaint was complete enough."

80.     It is commonly acknowledged standard of HR investigatory practices that an investigator should always interview the complaining party during the course of a discrimination investigation.[2]  Accordingly, it follows that WFS, who claims that "[e]thics and compliance at World Fuel Services is built into our culture" would follow basic EEOC investigative guidelines when investigating an employee's discrimination complaint.[3]

81.     WFS policy further provides, in relevant part:

**REPORTING DISCRIMINATION OR HARASSMENT**

Anyone who feels that he or she has been subjected to unlawful discrimination or harassment is strongly encouraged to immediately report the matter by: (1) informing your manager or supervisor; or (2) informing your designated Human Resources Business Partner or anyone within the Human Resources Department. You may also report discrimination or harassment to the Company's anonymous Compliance Hotline (toll free number: (877)-787-8742). Every report of alleged discrimination or harassment will be fully investigated and corrective action will be taken where appropriate. All information provided by World Fuel Services employees will be maintained on a confidential basis to the greatest extent possible.

---

[2] By way of a limited example, the Equal Employment Opportunity Commission's (EEOC) Enforcement Guidance of Vicarious Employer Liability for Unlawful Harassment by Supervisors, states, in relevant part, "[w]hen detailed fact-finding is necessary, the investigator should interview the complainant, the alleged harasser, and third parties who could reasonably be expected to have relevant information." *Id.* at §V.C.1. *citing* **Questions to Ask Parties and Witnesses** *available at* http://www.eeoc.gov/policy/docs/harassment.html (*last visited* February 10, 2020).

[3]   Ethics & Compliance *available at* https://www.wfscorp.com/en/About-Us/Ethics-and-Compliance (*last visited* February 10, 2020)

82.     WFS's investigation into Ms. McSwain's complaint was not full nor were the company's confidentiality provisions followed as Ms. McSwain's new supervisor (see below) had no reason to know of her complaint of discrimination.[4]

83.     On December 10, 2019, Mr. Casadeval called Ms. McSwain into his office. Present was Patrick Atkinson, a newly hired VR, HR Business Partner. Mr. Casadeval told Ms. McSwain that her complaint of discrimination was unfounded, that the October promotions were merely "retention incentives" and that Ms. McSwain did not receive such an incentive because she was "not at their level." To this pretextual after-the-fact justification[5], Ms. McSwain responded that she was doing two jobs since January 2018, that she earned an MBA from a top 20 school, and that she regularly provides HR Business Partnership consulting expertise regarding labor compliance, employee relations and immigration issues to the same HR Business Partners that received the promotion instead of her, to which Mr. Casadevale replied "you are not an HR Business Partner, you are HR Compliance."

84.     Mr. Casadevale's statement regarding Ms. McSwain's position was inaccurate[6]: as of December 10, 2019, WFS's records reflect that Ms. McSwain served as a P10094 Human Resources Sr. Manager and official title of Sr Manager, HR Business Partner.

_____

[4] Pretext (meaning a "cover up" for illegal discrimination) is established by a company's failure to follow its own policies. *Bass v. Board of County Com'rs, Orange County, Fla*., 256 F.3d 1095, 1108 (11th Cir. 2001) (departure from policies) *overruled in part on other grounds Crawford v. Carroll,* 529 F.3d 961 (11th Cir. 2008).
[5] Pretext (meaning a "cover up" for illegal discrimination) is demonstrated when the defendant "piles-on" or adds reasons for an adverse employment action which were not previously stated. *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1275 (11th Cir. 2017); *Mock v. Bell Helicopter Textron, Inc.*, 196 F. App'x 773, 774 (11th Cir. 2006).
[6] Pretext (meaning a "cover up" for illegal discrimination) is also established by employer dishonesty. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 147 (2000).

| Business Process | Initiated On | Effective Date | Status | Reason | Outbound Organization | Outbound Position | Inbound Organization | Inbound Position |
|---|---|---|---|---|---|---|---|---|
| Move Worker (Supervisory) Maria McSwain | 01/06/2020 08:46:53 PM | 12/20/2019 | Successfully Completed | | VP, Human Resources–Aviation & Marine (Maria Palacio) | P10094 Human Resources Sr Manager | VP, Human Resources Business Partner (Pat Atkinson) | P10094 Sr Manager, HR Business Partner |
| Promotion: Maria McSwain | 01/17/2018 02:57:56 PM | 01/01/2018 | Successfully Completed | Promotion > Promotion or Transfer > Promotion and Transfer | Chief Human Resources Officer (Michael Kasbar (Inherited)) | P08639 Manager, HR Compliance | VP, Human Resources–Aviation & Marine (Maria Palacio) | P10094 Sr Manager, HR Business Partner |
| Move Worker (Supervisory) Maria McSwain | 02/07/2017 02:48:14 PM | 01/15/2017 | Successfully Completed | | Chief Executive Officer and President (Michael Kasbar) | P08639 Manager, HR Compliance | Chief Human Resources Officer (Michael Kasbar (Inherited)) | P08639 Manager, HR Compliance/Im migration |
| Move Worker (Supervisory) Maria McSwain | 01/17/2017 09:27:30 AM | 01/15/2017 | Successfully Completed | | VP, People Operations (Michael Kasbar (Inherited)) | P08639 Manager, HR Compliance | Chief Executive Officer and President (Michael Kasbar) | P08639 Manager, HR Compliance/Im migration |
| Promotion: Maria McSwain | 12/16/2016 11:39:56 AM | 01/01/2017 | Successfully Completed | Promotion > Promotion or Transfer > Promotion | VP, People Operations (Bernardo Buraglia) | P01364 Sr HR Generalist | VP, People Operations (Bernardo Buraglia) | P08639 Manager, HR Compliance |
| Move Worker (Supervisory) Maria McSwain | 07/07/2013 05:04:11 PM | 07/06/2013 | Successfully Completed | | VP, Human Resources (Susan Rider) | P01364 Sr Generalist, Sr | VP, People Operations (Bernardo Buraglia) | P01364 Sr HR Generalist |

85.     The December 10, 2019, meeting ended with Mr. Casadevall stating that Ms. McSwain would now be reporting to Mr. Atkinson, meaning that Ms. McSwain's new supervisor would begin his supervisor relationship over Ms. McSwain fully aware that Ms. McSwain had a history of trying to enforce her USERRA rights vis-à-vis the company, which impacted the reporting relationship from day one. Mr. Atkinson scrutinizes everything that comes out Ms. McSwain's mouth and Ms. McSwain's direct report Karla Lorenzo noted that Mr. Atkinson began keeping a close eye on Ms. McSwain.[7]

**COUNT I**
**(Violations of USERRA 38 U.S.C. §§ 4312 & 4313)**

86.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

87.     Pursuant to USERRA, 38 U.S.C. § 4312, any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits under USERRA so long as: (1) the person (or an appropriate officer of the uniformed service in which such service is performed) has given advance written or verbal notice of such service to such person's employer; (2) the cumulative length of the absence and of all previous absences from a position

---

[7] Pretext (meaning a "cover up" for discrimination) is established by unwarranted or increased scrutiny of an employee. *Hairston v. Gainesville Sun Publ'g Co*., 9 F.3d 913, 921 (11th Cir. 1993) (surveillance "strongly suggests the possibility of a search for a pretextual basis for discipline").

of employment with that employer by reason of service in the uniformed services does not exceed five years; (3) the person serves honorably; and (4) with exceptions not applicable here, the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e).

88.     Plaintiff provided appropriate advance notice to her immediate supervisor, of her service in the military for the October 1, 2018 – October 31, 2018 timeframe.

89.     Plaintiff promptly requested re-employment both before and after the end of her military service.

90.     Plaintiff's total leave of absence for service in the military during the October 1 – October 31, 2018, timeframe was less than 5 years and Plaintiff was honorably discharged following completion of his military service.

91.     Plaintiff was denied proper reemployment insofar as she was not promoted to a Director position even though her peers received such promotions during the October 2018 timeframe, i.e. the time Ms. McSwain was away on military duty.

92.     Because Plaintiff satisfied the requirements of USERRA 38 U.S.C. § 4312, she was entitled to be reemployed by WFS in 2018 and re-employed into a position of like seniority, status, and pay that her peers achieved during the time she was away on military orders.

93.     Pursuant to USERRA, 38 U.S.C. § 4313(a)(1), a person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services for less than 91 days, must be promptly (i.e., within 14 days as provided by 20 C.F.R. § 1002.181) reemployed in a position of employment in accordance with the following order of priority:

> (A)     in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform; or

(B)        in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

94.    Defendant WFS did not reemploy Plaintiff in either position required by USERRA § 4313(a)(1) because Plaintiff was not elevated into a Director position even though her peers received Director promotions during the time she was on military leave.

95.    Defendant violated 38 U.S.C. § 4312 and 4313 of USERRA, among other ways, by refusing to promptly reemploy Ms. McSwain. Defendant's violation of § 4312-4313 has caused Ms. McSwain damages in an amount to be proven at trial.

### COUNT II
### (Violation of USERRA 38 U.S.C. § 4311(a))

96.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

97.    USERRA, 38 U.S.C. § 4311(a), prohibits an employer from discriminating against any person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service with respect to, among other things, employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

98.    Defendant WFS discriminated against Ms. McSwain by delaying her promotion during the 2016 timeframe because of her military deployment and by failing to promote Ms. McSwain in November 2018 following her return from the October 1 – 31, 2008, military duty.

99.    Defendant WFS's actions have caused Ms. McSwain damages in an amount to be proven at trial.

## COUNT III
### (Violation of USERRA, 38 U.S.C. § 4311(b))

100.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

101.    USERRA, 38 U.S.C. § 4311(b) provides that an employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.

102.    Ms. McSwain exercised her rights under USERRA by complaining of military related discrimination on both her behalf and on behalf of others. Ms. McSwain further exercised her USERRA rights by informing her employer of her military service obligations.

103.    Defendant WFS retaliated against Ms. McSwain by delaying her promotion (2016) or denying her promotion (2018).

104.    Defendant's actions have caused Ms. McSwain damages in an amount to be proven at trial.

## COUNT IV
### (Violation of USERRA, 38 U.S.C. § 4316 (b))

105.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

106.    The USERRA requires that an employer cannot, without cause, terminate (or demote) a reservist-employee (a) within 180 days of that employee's return to work from military duty provided that (b) the reservist-employee's military service exceeded 30 days.

107.     Ms. McSwain's October 1, 2018 – October 31, 2018 military service exceeded 30 days.

108.     WFS demoted Ms. McSwain on November 16, 2018 when it removed her Aviation & Maritime HR duties.

109.     WFS lacked "for cause" justification to demote Ms. McSwain.

110.     WFS's actions violated USERRA and caused Ms. McSwain damages in an amount to be proven at trial.

**(COUNT V Violation of USERRA – 38 U.S.C. § 4323)**

111.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

112.     Plaintiff is entitled to liquidated damages under USERRA because WFS knew, or showed reckless disregard for whether its conduct was prohibited under USERRA as WFS is a government contractor and also was mandated, by Congress, to maintain a poster in its workplace that informed its employees (and the WFS decision makers in this case) of reservist-employee rights under USERRA.

113.     Additionally, Ms. McSwain on numerous instances informed WFS management that its actions were in violation of USERRA. Ms. McSwain's attempts to educate WFS management on USERRA did not result in WFS changing its practices, instead it lead to increased retaliation by WFS management against Ms. McSwain.

**(COUNT VI Violation of USERRA – 38 U.S.C. § 4318)**

114.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

115.     USERRA, 38 U.S.C. § 4318(a)(2)(B), provides that an employee's service in the

uniformed service will be deemed to constitute service with the employer for purposes of determining the accrual of benefits under the retirement plan. This rule applies to the defined contribution plan that WFS has maintained for its employees, including Plaintiff, in which WFS will match retirement contributions that its employees make into the plan.

116. Pursuant to USERRA, 38 U.S.C. § 4318(b)(1), an employer reemploying a person after a period of service in the uniformed services is liable to the employee benefit pension plan for funding any obligation of the plan to provide benefits, including those accrued under USERRA § 4318(a)(2)(B). An employer must also make a contribution to a pension or retirement plan where the employer's contribution is "contingent on" the employee first making a contribution. 38 U.S.C. § 4318(b)(2).

117. Pursuant to USERRA, 38 U.S.C. § 4318(b)(3)(B), for purposes of computing an employer's liability under § 4318(b)(1), the employee's compensation during the period of uniformed service must be computed based on the compensation the employee would have ordinarily received had he not engaged in qualified military service when the employee's compensation was reasonably certain during the period of military service, and "in the case that the determination of [the employee's rate of compensation] is not reasonably certain, on the basis of the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period)." 38 U.S.C. § 4318(b)(3).

118. Here WFS violated USERRA § 4318 by not counting periods of short term military leave towards the compensation that it used to determine retirement contributions for periods of short term military leave, and refusing to provide Ms. McSwain with information that was necessary for her to know the amount of retirement contributions that she could make and WFS

would match.

119. By way of an example, in 2017 WFS contributed $2,652.08 to Ms. McSwain's 401K account. The plan states that the appropriate contributions should be 50% of the fist 6% of the employee's compensation. In 2017, Ms. McSwain's compensation totaled $93,628.94 which would require a $ 2,808.86 contribution.

120. Defendant's actions have caused Ms. McSwain to be damaged in an amount to be proven at trial.

### (COUNT VII Violation of USERRA – 38 U.S.C. § 4302)

121. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-85 above as if fully set forth herein.

122. The USERRA makes clear that its provisions trump any state law or company policy that in any way limits the protections USERRA provides.

123. WFS's military leave notification policy provides, in relevant part:

You must notify the Human Resources Department of your need for military leave as soon as practicable after you become aware of the need for such leave. **You also need to bring your official military service orders to the Human Resources Department for review prior to commencement of the leave.**

124. The USERRA makes clear that an employee does not need to provide orders to his or her employer before leaving work to serve in the military. The USERRA regulations provide that the military leave "notice may be informal and does not need to follow any particular format." 20 C.F.R. §1002.85(c)&(d). At times "[i]t may be impossible or unreasonable to give advance notice under certain circumstances. Such circumstances may include…a requirement that the employee report for uniformed service in an extremely short period of time." 20 C.F.R. §1002.86(b).

125.     To the extent that Defendant alleges application of any agreement that constitutes any limitation on Ms. McSwain's rights under USERRA, it is illegal, null and void, inapplicable and of no force or effect pursuant to 38 U.S.C. § 4302.

126.     Defendant's use of the above policy has caused Ms. McSwain damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays that judgement be entered against Defendant WFS on all claims and requests that this Court award the following relief:

A.     Declare Defendant's additional conditions to obtain re-employment should be void under USERRA, 38 U.S.C. § 4302(b) and enjoin Defendant from imposing such conditions in the future.

B.     Declare that Defendant has failed to comply with USERRA, 38 U.S.C. §§ 4311, 4312 and 4313 and require that Defendant comply with each of those sections.

C.     Require that Defendant compensate Plaintiff for any losses of wages or benefits in the amount to be proven at trial, including back pay, front pay, pre- and post-judgment interest, lost benefits of employment, negative tax consequences of any award, for Defendant's failure to comply with USERRA

D.     Require Defendant to pay Plaintiff liquidated damages in amount to be proven at trial.

E.     Enjoin Defendant from taking any future retaliatory action against Plaintiff or other servicemembers who attempt to enforce their rights under USERRA.

F.     Pursuant to 38 U.S.C. § 4323(h), and as otherwise provided by law. Require Defendant to pay Plaintiff's attorney fees, expert witness fees, litigation expenses and costs to bring this action.

G.     Grant such other and further relief as this Court deems just and equitable.

Dated: March 19, 2020

*/s/ John D. Agnew*
JOHN D. AGNEW
BOY AGNEW POTANOVIC, PLLC
4414 Metro Parkway, Ste. 110
Fort Myers, FL 33916
Telephone: 239-208-6500
Email: johna@bapfirm.com

*/s/ Matthew Z. Crotty*
MATTHEW Z. CROTTY, *Pro Hac Vice To Be Filed*
CROTTY & SON LAW FIRM, PLLC
905 West Riverside, Suite 404
Spokane, WA 99201-0300
Telephone: 509-850-7011
Email: matt@crottyandson.com

*/s/ Thomas G. Jarrard*
THOMAS G. JARRARD, *Pro Hac Vice To Be Filed*
LAW OFFICE OF THOMAS G. JARRARD
1020 N. Monroe St.
Spokane, WA 99201
Telephone: 425-239-7290
Email: tjarrard@att.net

Attorneys for Plaintiff